UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION

NO. 5:25-CR-22-BO

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | |
| v. ) | CRIMINAL INFORMATION |
| ) | |
| MITCHELL SUMMERFIELD ) | |
| ) | |

The United States Attorney charges the following:

## Introduction

### The COVID-19 Pandemic Benefit Scheme

**A.** **Regulatory and Program Background**

*Economic Injury Disaster Loans ("EIDL")*

1. The United States Small Business Administration ("SBA") is an agency within the Executive Branch of the government of the United States that provides support to entrepreneurs and small businesses. The mission of the SBA is to maintain and strengthen the nation's economy by enabling the establishment and viability of small businesses and by assisting in the economic recovery of communities after disasters. As part of this effort, the SBA enables and provides for loans through banks, credit unions and other lenders. These loans have government-backed guarantees.

2. In addition to traditional SBA funding programs, the Coronavirus Aid, Relief, and Economic Security ("CARES") Act, which was signed into law in March

2020, established several new temporary programs and provided for the expansion of others to address the COVID-19 outbreak. Specifically, the CARES Act was enacted to provide emergency financial assistance to the millions of Americans who were suffering the economic effects caused by the COVID-19 pandemic.

3. The CARES Act enabled the SBA to expand the pre-existing EIDL funding to business owners negatively affected by the COVID-19 pandemic. EIDL funding provides loan assistance up to $2 million for small businesses and other eligible entities. The funds are issued directly from the United States Treasury and applicants used the SBA online portal to apply for monetary relief in the form of disaster benefits. The online application required information regarding the size of the affected business entity, the ownership, number of employees, and gross business revenues realized in the 12-months prior to COVID-19's impact on the national economy. The application also required the business owner to disclose any criminal history. No supporting documentation was required.

4. In conjunction with the submission of an EIDL application, a business could obtain a $10,000 cash advance grant based solely on the number of employees claimed. The businesses were not required to repay the SBA even if the loan application was ultimately denied or the applicant declined the EIDL loan once approved. EIDL proceeds could be used by the afflicted business to pay fixed debts, payroll, accounts payable, and other bills that could have been paid had the COVID-19 disaster not occurred; however, such loan proceeds are not intended to replace lost sales or profits or for expansion of a business.

5. The application required the business representative to declare under penalty of perjury that the information contained therein was true and correct, and it warned that any false statement or misrepresentation to the SBA or any misapplication of loan proceeds may result in sanctions, including criminal penalties.

6. EIDL applications are received in a cloud-based platform (Rapid Finance) through a server located in Des Moines, Iowa. EIDL disbursement payments are initiated by the SBA Denver Finance Center, located in Denver, CO, which transmits the payment information through the Financial Management System ("FMS") to the Treasury. The primary server for FMS is in Sterling, VA. The EIDL loan applications were primarily filed in North Carolina via wire, processed by the SBA through their server in Des Moines, Iowa, and the payments were then transmitted through Virginia into the respective bank accounts discussed above.

*The Paycheck Protection Program*

7. In addition to EIDL funding, another source of relief provided by the CARES Act was the authorization of up to $349 billion in forgivable loans to small businesses for job retention and certain other expenses, through a program referred to as the Paycheck Protection Program ("PPP"). In or around April 2020, Congress authorized over $300 billion in additional PPP funding.

8. In order to obtain a PPP loan, a qualifying business was required to submit a PPP loan application, signed by an authorized representative of the business. The PPP loan application required the business (through its authorized representative) to acknowledge the program rules and make certain affirmative

3

certifications in order to be eligible to obtain the PPP loan. In the PPP loan application, the small business (through its authorized representative) was required to state its average monthly payroll expenses and its number of employees, among other things. These figures were used to calculate the amount of money the small business was eligible to receive under the PPP. In addition, businesses applying for a PPP loan were required to provide documentation showing their payroll expenses.

9. A PPP loan application was processed by a participating financial institution ("lender"). If a PPP loan application was approved, the participating lender would fund the loan using its own monies, which were guaranteed by the SBA. Data from the application, including information about the borrower, the total amount of the loan, and the listed number of employees, was transmitted by the lender to the SBA in the course of processing the loan.

10. PPP loan proceeds were required to be used by the business on certain permissible expenses, including payroll costs, mortgage interest, rent, and utilities. Under the applicable PPP rules and guidance, the interest and principal on the PPP loan was eligible for forgiveness if the business was eligible for the PPP loan it received, spent the loan proceeds on these permissible expense items within a designated period of time, and used a certain portion of the loan proceeds for payroll expenses.

11. United Bank and Customers Bank were financial institutions within the meaning of Title 18, United States Code, Section 20, whose accounts and deposits of which were insured by the Federal Deposit Insurance Corporation. Customers Bank

4

is headquartered in Charleston, West Virginia, and United Bank is headquartered in Phoenixville, Pennsylvania. These financial institutions participated in the SBA's PPP program and, as such, were authorized to lend funds to eligible borrowers.

### B. The Fraud Scheme

12. Mitchell SUMMERFIELD is a resident of Apex, North Carolina, in the Eastern District of North Carolina. SUMMERFIELD is the sole owner of several entities, including KHS Investments, LLC ("KHS"), Vision and Destiny, LLC ("Vision and Destiny") and Winning Ways, Inc. ("Winning Ways"). KHS, Vision and Destiny, and Winning Ways are all run by SUMMERFIELD out of his Apex residence.

*KHS Investments, LLC*

13. KHS is a real estate investment company owned solely by SUMMERFIELD. However, KHS is a non-operational entity; it does not engage in any business activity and has historically generated no income. Instead, it was primarily used as a pass-through for SUMMERFIELD to transfer money between other personal and business accounts.

14. On April 4, 2021, S.A., SUMMERFIELD's accountant, electronically submitted a PPP application with Customers Bank for KHS Investments, LLC ("KHS"). The PPP application contained false statements, including the amount of gross revenues. In support of the application, S.A. also submitted a fraudulent IRS Form 1040.

15. KHS's PPP loan was approved, and on April 29, 2021, Customers Bank deposited $20,833 into KHS's Suntrust Bank account ending in x7375. Prior to this

Case 5:25-cr-00022-BO   Document 1   Filed 01/28/25   Page 5 of 11

deposit, the bank account had a balance of approximately $300.00. SUMMERFIELD used the PPP loan proceeds to purchase personal items, including designer clothing and family planning.

16. On July 13, 2020, E.L., SUMMERFIELD's accountant, electronically submitted an EIDL application on behalf of KHS investments. The EIDL application contained several false statements, including the amount of gross revenues. In support of the application, E.L. also submitted a fraudulent IRS Form 1040. The PPP application was approved and on January 25, 2021, the SBA deposited $75,100 into KHS's Suntrust Bank account ending in x7375. Prior to this deposit, the bank account had a balance of $135.00.

17. On April 27, 2021, SUMMERFIELD requested additional EIDL funds for KHS. On July 8, 2021, SUMMERFIELD electronically signed a new loan agreement. On July 13, 2021, the SBA deposited $125,500 into KHS's Suntrust Bank account ending in x7375. Prior to this deposit, the bank account had a balance of $961.00. SUMMERFIELD used the fraud proceeds to pay for personal expenses, including shopping, airline flights, among other things.

18. In August 2021, SUMMERFIELD requested a third round of EIDL funding for KHS. However, the SBA flagged the loan as fraudulent and denied his request.

*Vision and Destiny, LLC*

19. Vision and Destiny is a public speaking business owned solely by SUMMERFIELD. On March 11, 2021, S.A., SUMMERFIELD's accountant,

submitted a fraudulent PPP application for Vision and Destiny with United Bank. The application listed a Washington, D.C. address for the business; however, SUMMERFIELD never lived at this address and as noted above, the business was operated out of SUMMERFIELD's Apex, North Carolina, residence. SUMMERFIELD and S.A. discussed submitting fraudulent documentation to support the application, including IRS Form 1040, which was entirely fabricated. The PPP application was approved, and on or about March 18, 2020, $20,833 was deposited into SUMMERFIELD's United Bank account ending in x3298. SUMMERFIELD used the PPP funds for personal expenses.

### *Winning Ways, Inc.*

20. In July 2020, SUMMERFIELD contacted V.M. who owned a financial company, about submitting an EIDL application for Winning Ways. Winning Ways was created to be a home for teen mothers, but the business was never operational. V.M. agreed to assist SUMMERFIELD with the application but told SUMMERFIELD that he would need to provide the supporting documentation.

21. On July 1, 2020, V.M. submitted the EIDL application on behalf of Winning Ways. The application contained several false statements, including the listed gross revenues, cost of goods sold, and the number of employees. An initial $10,000 cash advance was approved, and on July 6, 2020, the SBA deposited $10,000 into Winning Ways's BB&T Bank account ending in x0065. The full EIDL application was ultimately approved, and on July 21, 2020, the SBA deposited $149,900 into

7

Winning Ways's BB&T Bank account ending in x0065. Prior to this deposit, the bank account had a balance of $60.00.

22. On July 6, 2021, SUMMERFIELD contacted the SBA to request additional funding. That request was denied.

23. SUMMERFIELD used the EIDL funds to repay an unrelated loan and for consulting services unrelated to the business.

## COUNT ONE

24. The preceding paragraphs of this Criminal Information are incorporated herein by reference as factual allegations.

25. From on or about July 13, 2020, until on or about July 6, 2021, in the Eastern District of North Carolina and elsewhere, the defendant, MITCHELL SUMMERFIELD and others, known and unknown to the United States Attorney, did knowingly combine, conspire, confederate, agree, and have a tacit understanding with each other to commit offenses against the United States, *to wit:* Wire Fraud, in violation of Title 18, United States Code, Section 1343; and Bank Fraud, in violation of Title 18, United States Code, Section 1344.

### Objects of the Conspiracy

26. *Wire Fraud:* It was a part and an object of the conspiracy that SUMMERFIELD and others, known and unknown to the United States Attorney, having devised the above described schemes and artifices to defraud and to knowingly execute the schemes and artifices to defraud, and to obtain money and property by means of materially false and fraudulent pretenses, representations and promises,

and attempting to do so, did transmit and cause to transmitted by means of wire communication in interstate commerce, any writing, sign, signal, picture, and sound for the purposes of executing said schemes and artifices, in violation of Title 18, United States Code, Section 1343.

27. *Bank Fraud*: It was a part and an object of the conspiracy that SUMMERFIELD and others, known and unknown to the United States Attorney, did execute and attempt to execute, the above-described schemes and artifices to defraud and to obtaining moneys owned by, or in the custody or control of financial institutions, by means of materially false and fraudulent pretenses, representations, and promises, in violation of Title 18, United States Code, Section 1344.

All in violation of Title 18, United States Code, Section 1349.

(Remainder of page intentionally left blank.)

## FORFEITURE NOTICE

Notice is hereby given that all right, title and interest in the property described herein is subject to forfeiture.

Upon conviction of any violation of, or conspiracy to violate, Section(s) 215, 656, 657, 1006, 1007, 1014, 1341, 1343, or 1344 of Title 18 of the United States Code affecting a financial institution, the defendant shall forfeit to the United States, pursuant to 18 U.S.C. § 982(a)(2)(A), any property constituting, or derived from, proceeds obtained directly or indirectly as a result of the said violation.

The forfeitable property includes, but is not limited to, the following:

Forfeiture Money Judgment:

a) A sum of money representing the gross proceeds of the offense(s) charged herein against MITCHELL SUMMERFIELD, in the amount of at least $402,166.00.

If any of the above-described forfeitable property, as a result of any act or omission of a defendant: cannot be located upon the exercise of due diligence; has been transferred or sold to, or deposited with, a third party; has been placed beyond the jurisdiction of the court; has been substantially diminished in value; or has been commingled with other property which cannot be divided without difficulty; it is the

intent of the United States, pursuant to Title 21, United States Code, Section 853(p), to seek forfeiture of any other property of said defendant up to the value of the forfeitable property described above.

MICHAEL F. EASLEY, JR.
United States Attorney

*/s/ Lisa K. Labresh*

By: Lisa K. Labresh
Special Assistant U.S. Attorney